The right of the plaintiff to relief does not rest alone upon the ordinance of the Convention or the act of the *Page 143 
Legislature, but upon the broad ground that the courts are bound to administer justice and enforce the execution of contracts.
In 1862 the defendant agreed to sell to the plaintiff a house and lot, and received $2,500 in Confederate treasury notes as the consideration, and put him in possession. The contract had no special political significance, and there is no averment that it was entered into with an intent to give aid to the rebellion; so it is to be taken as a dealing in the ordinary transaction of business. The plaintiff bought the house and lot because it suited him. The defendant took the Confederate notes because she needed funds.
It is said that every dealing in Confederate treasury notes gave them credit and circulation, and consequently aided the (201) rebellion; so every such dealing was illegal and not fit to be enforced by the courts, without reference to the intent of the parties. The proposition is general — every man and woman who, in the ordinary course of business, received a Confederate note did an illegal act, tainted with treason. It embraces all contracts, as well contracts executed as executory; for if true as to one, it is also true as to the other, and it aims a blow at all dealings among our people during the war, and upheaves the foundations of society. I do not believe the proposition can be maintained by any authority or any principle of law.
1. That may be conceded that if, at the outbreak of an insurrection, parties to contracts, with a view of aiding the cause by giving credit and circulation to its paper, receive it as money in their dealing, such contracts are illegal.
But that is not the case under consideration.
In 1862 the contest had assumed the magnitude and proportions of war; each party in territorial limits had the boundaries of a mighty nation, and each party counted its people by millions. The "Confederate States" was recognized by the nations, and by the United States itself, as a belligerent power, entitled to the rights of war; and, in the exercise of its powers, it had issued paper as the representative of money, which excluded all other currency, and constituted the only circulating medium ofthe country. The government of the United States was unable to protect the people, and there was no currency but Confederate treasury notes. In this condition of things, was every man to stop his ordinary avocations and starve, or else be tainted with treason and deemed guilty of an illegal act if he received a Confederate treasury note?
The Attorney-General of the United States, in his opinion on the subject of disfranchisement, uses this language: "Officers in the rebel States who, during the rebellion, discharged official duties, (202) not incident to war, but in the preservation of order and the *Page 144 
administration of law, are not to be considered as thereby engaging in rebellion. The interests of humanity require such officers for the performance of such official conduct in time of war or insurrection as well as in time of peace, and the performance of such duties can never be considered as criminal." Was a judge to cease to do these "duties required by the interests of humanity" — "the performance of which can never be considered as criminal" — or was he to perform the duties and starve, rather than commit an illegal act by receiving his salary inConfederate treasury notes? Was the merchant to close his store, the blacksmith and shoemaker to quit work, and the farmer to let his tobacco and surplus grain rot on his hands, and allow his family to suffer for clothing and the other necessaries of life, or do an illegal act by receiving Confederate notes? Really, unless the receiving of such notes can be connected with a criminal intent to aid the rebellion, the question seems to me too plain to admit of argument. A naked statement exposes the absurdity of the proposition. The courts must act on the presumption that Confederate notes were received in ordinary dealing — not for the purpose of aiding the rebellion, but because there was no other currency.
2. Look at the subject in another point of view: At the close of the war the President granted amnesty and pardon to all, save a very few individuals. Congress by the Reconstruction Act disfranchised only those who, having taken an oath to support the Constitution of the United States, afterwards engaged, actively, in the rebellion, and it has refused to enforce the rigorous measure of confiscation. On what principle, then, can it be that the courts are called upon to take up the matter "at the little end," to search into the private dealings of the people and all the ramifications of ordinary business, and declare (203) of no force — in effect confiscate — all contracts based upon the consideration of Confederate notes? What good can result from this action of the courts? It can have no effect upon the rebellion, for that is over. It can have no effect upon the future, for "necessity knows no law," and whenever a condition of things occurs, in which the people must use the only currency of the country or starve, the currency will be used. The idea of the courts assuming the duty of preventing civil wars by holding that it is illegal to receive the paper of rebels in ordinary business transactions, when there is no other currency, that such contracts are not fit to be enforced, presents to my mind a palpable absurdity. So, what good will be done by this action of the courts? None, save only to show, on the part of the courts, a detestation of treason by treading on the extremities of the monster after it is dead.
3. In Blossom v. Van Amringe, ante, 133, the maxim, ex turpi causa *Page 145 actio non oritur, was pressed on the court, and it was insisted that, as the parties had made a transfer of property, in fraud and deceit, withan intent to evade the confiscation acts of the government of the Confederate States, the case fell under the maxim. The court says: "The objection would no doubt have been fatal if taken before a court of thede facto State government, while it formed a part of the Confederate States; but this court is a coordinate branch of a rightful government, forming a part of the United States, and can not entertain such an objection." In our case the matter is reversed. The turpitude, if any, was aimed at the United States, and the maxim applies, provided there be the criminal intent. That is the question! I deny the intent — there is no evidence of it or anything from which it can be implied. It can not be held that the mere receiving a Confederate note was illegal and base, without involving in the imputation of baseness every man and woman in the State! The minister of the gospel, the judge, who received his salary; the physician, the merchant, the mechanic, the (204) farmer, who carried on his ordinary business, the poor seamstress, who, at the end of the day, received her hard-earned wages — were all guilty of an act so base that the doors of the courts of justice must be shut against them! The proposition is monstrous. During the war a farmer should not have made more grain than enough to support himself and family; making a surplus was illegal — it aided the rebellion. If every man had quit work the rebel army could not have been sustained, the war would have been stopped by starvation. We were told in the argument that "gold, as well as iron, is a sinew of war." It may be added, meat and bread are also sinews of war. Reductio ad absurdum!
4. But, it is said, the consequences of holding all such dealings to have been illegal will not be so grievous after all, for, in its practical application, the maxim will only make void executory contracts. The principle, if a sound one, evidently includes all contracts, executed as well as executory, and the admission that in practice it can only be made to reach the latter demonstrates the impotence and absurdity of this action of the courts as a means of putting a stop to civil wars. Let us see how it is to operate: A man buys a tract of land, pays for it in Confederate notes and takes a deed. The court can not reach him, for it is met by the maxim,"in pari delicto melior est conditio defendantis"; so he keeps the land, not because he is innocent, but because the court can not take it from him and restore it to the original owner, who is equally guilty. If one has paid off a bond in Confederate notes, whether the creditor will be allowed to sue on the original debt, which is not tainted with this "turpi causa,"
is a problem that I will not undertake to solve. *Page 146 
But supposing the bond is only paid in part, the payment must be rejected; for, being in Confederate notes, it is of no more legal effect than if made in counterfeit money. Or suppose, in our case, that (205) Mrs. Hooker brings ejectment for the land; the contract has been in part performed, and the defendant is in possession, will the court shut its doors against her, on the maxim, in pari delicto?
In short, is the practical application of this novel principle to be allowed to cover all intermediate cases, when the contract has not been fully executed, or is it to be confined to contracts wholly executory, where the purchaser has paid the price, but, in the simplicity of his innocence, has neglected to take a deed, and has not even taken possession? The amount of it is: all who required the Confederate notes to be paid down, or who have taken deeds and acquittances under seal, although equally guilty, are to go unpunished, and only those who gave credit to their neighbors, or who neglected to take deeds, are to be made victims to the vengeance of the law, while the remiss debtors and dishonest vendors are to be the sole gainers, although equal participants in the illegal act. Lame and impotent conclusion!
Thus encouragement is to be given to dishonesty, justice is not to be administered, and the people of the country are to be involved in utter perplexity and confusion, in order to make a useless show of zeal on the part of the courts "to punish rebels."